***********
The Full Commission has reviewed the Deputy Commissioner's Opinion and Award based on the record of the proceedings before the Deputy Commissioner. The appealing party has shown good grounds to reconsider the evidence and to receive further evidence. Having reviewed the competent evidence of record, the Full Commission hereby reverses the Deputy's Opinion and Award and awards benefits as explained below.
 *********** EVIDENTIARY RULING
Plaintiff objects to the deputy commissioner's order quashing the deposition of Dr. Tew and the statement in the deputy's Opinion and Award that the deposition of Dr. Tew was not allowed because he was not timely identified. The deposition of Dr. Tew was noticed by plaintiff, attended by both parties, and was presented to the Full Commission as an offer of proof concerning Dr. Tew's testimony.
The Full Commission notes that on page 74 of the Transcript of the deputy commissioner hearing, Mr. Brown, counsel for plaintiff, stated that he and counsel for defendant had stipulated to take the deposition of Dr. Tew. No objection or dispute to this statement was made by defendant's counsel on the record. Therefore, the Full Commission finds that Dr. Tew was identified in the deputy commissioner hearing and admits his deposition as evidence in the record for this proceeding.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the deputy commissioner hearing as
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. The deceased employee plaintiff was Leonard Madison. He is survived by his widow, Mary Brown Madison, and his minor child, Leonard Todd Madison.
3. The defendant is employer International Paper Company, a duly qualified self-insured company ("Defendant").
4. The defendant servicing agent is Liberty Mutual Insurance Company. ("Defendant").
5. Employer regularly employs three or more employees and is bound by the provisions of the North Carolina Workers' Compensation Act. The employer-employee relationship existed between the employer and the employee on August 15, 1997, the plaintiff's date of death.
6. Plaintiff's average weekly wage at the time of his injury was sufficient to yield the 1997 statutory amount of $512.00 per week, in the event plaintiff's claim is found compensable.
7. All parties are properly before the Commission, the Commission has jurisdiction over the parties and subject matter, and they are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
8. In addition, the parties stipulated into evidence the following:
1. Deposition of Dr. Woodworth.
2. Deposition of Dr. Crane.
3. Deposition of Dr. Almeida.
4. Packet of stipulated exhibits.
5. Four color photos marked as Exhibit 26.
6. Security incident report marked as Exhibit 27.
The Pre-Trial Agreement dated September 17, 2001 which was submitted by the parties is incorporated by reference.
 ***********
Based upon all of the competent evidence in the record, the Full Commission make the following
 FINDINGS OF FACT
1. On September 15, 1997, Leonard E. Madison, hereinafter "decedent," was sixty years old. He had worked for defendant paper mill and its predecessors since September 1979. His job was 5A or B utility worker, and he had worked in the utility department since 1994. Utility workers such as decedent were required to clean railroad cars, load trucks, sweep, mop, clean the bathrooms, vacuum the dryers, and help to get the paper machines back on line after they had been brought down for some reason.
2. The Carolina King dryer in the building where decedent worked was an enormous machine, at least the size of half a football field and four levels high. Each level had a catwalk running beside it for employees to access the dryer. There were approximately fifteen doors on each side of the dryer at each of the four levels. The doors remained closed while the dryer was operating. Wet pulp material entered the machine on one end and dried as it was carried through the machine so that it formed a continuous sheet of raw paper which came out the other end. If the sheet broke so that the machine had to be rethreaded, the dryer was turned off and allowed to cool. Employees would then go through the doors on the sides of the machine at each level in order to rethread the dryer.
3. The dryer was located in a very large building at the paper mill site. The building as a whole was not air-conditioned, but there were large fans at or on the roof and there was also a control room for the dryer section which was air-conditioned. A break area for the employees was located within the control room.
4. Each utility worker had to vacuum the lint traps on one level of the dryer at sometime during his shift. Decedent would clean either the first or second level. In order to do this job, the worker would open one of the doors, reach through the doorway with a vacuum wand and vacuum the two filters which were located beside and perpendicular to the doorway. Since the filters were approximately ten feet high, the employee would have to reach through the opening with his arm and shoulder in order to vacuum the highest section. However, he would not actually step through the doorway. The entire process for each dryer door took two to three minutes. The utility worker would then shut the door, walk down the catwalk to the next door and then repeat the process.
5. At each door, the employees were exposed to heat coming out of the dryer similar to opening a hot oven, except that there was a much taller door in this instance. The inside of the dryer where the pulp went through was well over two hundred degrees. Due to the heat exposure, the employees were trained in how to avoid and recognize symptoms of heat exhaustion. They were also advised that they could perform this task whenever they wanted and at whatever rate they chose. Many of the utility workers would go down one side of the dryer to complete the fifteen doors there and would then go into the control room to cool off before going down the other side of the dryer. Others would divide the task into quarters and take twice as many breaks. There were also employees who would complete the entire level at one time before taking a break. The longest time it would take to complete an entire level would be approximately two hours including the break times.
6. The utility workers wore special gloves while vacuuming the dryer lint because the vacuum wand would get hot to touch. There was no other safety equipment specifically provided for heat exposure.
7. The evidence did not disclose how decedent normally vacuumed the dryer lint or when he usually took his breaks. However, it was clear that this was a task that he performed every workday unless there was a problem with the machine.
8. On Friday August 15, 1997, decedent clocked in for work at 2:39 P.M. He was observed vacuuming dryer lint during the last two hours of his work shift. Since it had been a typically hot August day, he presumably waited until the coolest part of his shift to do the hot job. He did not make any known complaints regarding his physical status at any time during his shift. At 10:36 P.M. he clocked out and walked to his truck. However, instead of driving home, he drove to the main gate of the paper mill and informed the security officer there that he was having chest pain and needed medical assistance. Consequently, the guard called the rescue squad. Decedent's supervisor and the emergency response team at the paper mill were also summoned.
9. Randy Stephens, who was decedent's supervisor, came out to the gate and found decedent sitting in his truck. Decedent told him that when he had gotten to his truck, he had begun to feel chest pain such that he decided that he should go back and report the situation. During the conversation he also mentioned that he thought he had gotten too hot. He was sweaty at the time. However, the outdoor temperature was still over 80 degrees. Kenneth Dowless, an emergency medical technician who worked at the paper mill and who was on the emergency response team, then arrived and assessed decedent's condition. Decedent was alert and responsive to questions. He said that he felt pretty good except for some tightness in his chest, that he had eaten supper and had had drinks periodically and that he had been vacuuming the dryer. He also told Mr. Dowless that he had not felt good as he was walking from the job to the clock house.
10. An ambulance arrived and Mr. Dowless helped load decedent into it. While en route to the hospital, Mr. Dowless began to take his blood pressure. At that time decedent appeared to have a major heart attack. Efforts to revive him in the ambulance and subsequently at the emergency room were unsuccessful. After his death, medical personnel questioned his wife who indicated that she had no knowledge that he had heart problems. Since there was no prior history of heart problems and since there had been a hearsay report that he had been exposed to extreme heat at work, the emergency room physician contacted the local medical examiner who then ordered an autopsy.
11. Dr. Almeida, a pathologist, performed the autopsy and found that decedent had an enlarged heart with a hypertrophic left ventricle, severe coronary artery atherosclerosis, an enlarged liver, an enlarged spleen and mild nephrosclerosis of the kidneys. The findings were consistent with significant coronary artery disease and hypertension. One of the primary coronary arteries was ninety-five percent blocked with plaque. In view of the findings, Dr. Almeida concluded that decedent had died from ischemic heart disease with hypertrophic cardiomyopathy, or rather from lack of blood supply to the heart plus an enlarged heart, which could alone cause sudden death. Consequently, the medical examiner decided that there was no need to refer the matter to OSHA for further investigation.
12. Decedent was a smoker. His mother had died of a heart attack. However, he was apparently the type of man who had an aversion to doctors. The only record of prior medical treatment arose from a referral by the plant nurse in August 1996 when she checked his blood pressure in association with a routine hearing test and found it to be 220/130. She sent him to Urgent Care and told him that he would have to have a medical excuse before he could return to work. Consequently, decedent sought treatment with Dr. Eskander who placed him on medication. Once his blood pressure appeared to be coming under control, Dr. Eskander allowed decedent to return to work. However, decedent was supposed to continue to follow-up with the doctor not only regarding his blood pressure but also for high cholesterol which had been diagnosed after laboratory tests. Despite these diagnoses, decedent did not go back for further medical care.
13. By August 15, 1996 decedent had developed serious medical problems associated with his untreated hypertension, including a severely enlarged heart, an enlarged liver, an enlarged spleen and some hardening of his kidneys. His heart was so enlarged that he was at risk for sudden death from that condition alone. However, he also had serious coronary artery disease which was almost totally blocking one of his coronary arteries. Consequently, he was also at risk of having a major heart attack at any time, even at rest.
14. The parties went to great lengths to offer testimony regarding the heat exposure associated with vacuuming the dryer vents. However, it was also clear from the evidence that decedent performed his regular job duties that day without any known unusual conditions or incidents. Nor was there any evidence of unusual or extraordinary exhaustion on his part. He had cleaned dryer vents at work for years. There was nothing proven to have been unusual or out of the ordinary in the manner that he cleaned them that evening. He was always exposed to heat from the dryer in the process. Consequently, exposure to heat at work was not an untoward event.
15. Plaintiff failed to establish that decedent's heart attack was caused by heat stroke. The evidence does not establish that decedent suffered from heat exhaustion or heat stroke that lead to his heart attack. Mr. Stephens, Mr. McPherson, and Mr. Dowless (an EMT), testified that plaintiff was sweating, alert, conscious, oriented, conversational, and not vomiting or experiencing cramping. They further testified that plaintiff was clutching his chest in the area of his heart and complaining of chest pains. These symptoms are classic for a heart attack and are contrary to heat stroke. Dr. Murray explained that heat stroke victims are often manic, disoriented, confused, delirious, or unconscious, and that the victim's skin is generally dry and hot because sweating has ceased and the body temperature may have risen to 104 degrees or higher. The description of decedent's condition by Mr. Stephens, Mr. McPherson, and Mr. Dowless is not consistent with the medical factors necessary to establish heat exhaustion, and thereby the Full Commission finds that plaintiff did not suffer from heat stress, heat exhaustion, or heat stroke at the time of his heart attack.
16. Plaintiff presented testimony from Mark A. Friend, Ed.D., CSP, as an expert on OSHA regulations and employee health and safety. Dr. Friend expressed that decedent's work, because of exposure to excessive heat, placed him at a greater risk of heart-related illness in contrast to persons who did not work cleaning the paper dryers. Consistent with Dr. Friend's deposition, Dr. Tew and Dr. Almeida testified that heat could be a stressful situation which could contribute to a heart attack. Dr. Tew opined that heat was a significant contributing factor to decedent's heart attack. Dr. Tew testified that he did not know the symptoms of heat stress, heat exhaustion, or heat stroke, and stated that it was not necessary for him to examine this situation to determine that the heat exposure was a contributing factor to plaintiff's heart attack. The Full Commission, therefore, concludes that heat can contribute to a heart attack without necessarily causing heat stress, heat exhaustion, or heat stroke.
17. Decedent was never diagnosed with heat stroke. He died due to cardiac arrest associated in substantial part with his preexisting medical conditions. In fact, decedent's coronary artery occlusion was a "widow maker" — a medical term which refers to the severity and the location of his coronary artery occlusion. The medical evidence, however, particularly from the second deposition of Dr. Almeida and from his autopsy report, establishes that a "contributing factor" to the heart attack was decedent's work "in a hot environment." Although the evidence does not establish that decedent suffered from heat exhaustion or heat stroke, the uncontroverted medical evidence is that decedent was exposed to a "special hazard," heat, in the course of his employment and that the "special hazard" was a contributing factor to his heart attack and death.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission make the following
 CONCLUSIONS OF LAW
1. On August 15, 1997, decedent sustained an injury by accident arising out of and in the course of his employment with defendant-employer. G.S. § 97-2(6); Fields v. Tompkins-Johnston Plumbing Co., 224 N.C. 841,32 S.E.2d 623 (1945); Dillingham v. Yeargin Construction Co., 320 N.C. 499,358 S.E.2d 380 (1987). Plaintiff has established that his employment subjected him to a particular or special hazard from the elements which caused his heart attack and resulting death. In Fields v.Tompkins-Johnston Plumbing Co., the Supreme Court recognized a "special hazard" exception to the general rule that a heart attack while performing your usual work duties is not an accident:
 ". . . where the employment subjects a workman to a special or particular hazard from the elements, such as excessive heat or cold, likely to produce sunstroke, or freezing, death or disability resulting from such cause usually comes within the purview of the compensation acts. . . . The test is whether the employment subjects the workman to a greater hazard or risk than that to which he otherwise would be exposed.
224 N.C. 841, 842-43, 32 S.E.2d 623, 624 (1945) (highlight added);Dillingham v. Yeargin Construction Co., 320 N.C. 499, 358 S.E.2d 380
(1987). Under the Fields and Dillingham exceptions to the requirement that the injury arise from an accident or untoward event, when "the conditions of employment expose the claimant to extreme heat or cold, injuries such as heatstroke, heat exhaustion, heat prostration, sunstroke, freezing, and frostbite are considered accidental."Dillingham, 320 N.C. at 503. The question raised by this case is whether the Fields and Dillingham exceptions are limited, in cases of heat exposure, to injuries where the "special hazard" of heat produces "heatstroke, heat exhaustion, heat prostration, or sunstroke."
The general rule is that, "when an employee suffers from a potentially fatal preexisting disease, it is presumed that death results from natural physiological causes and the burden is placed on claimant to supply evidence overcoming this presumption and associating the death with employment." 1 Larson's Workers Compensation Law § 7.04[2][a] at 7-25 (2000). Under the evidence of this case, the Commission finds that plaintiff's exposure to heat in his employment did not cause the heat related conditions of heatstroke, heat exhaustion, or heat prostration. This fact could lead the Commission to apply the presumption and find that plaintiff's heart attack is not compensable.
In Dillingham, however, the Supreme Court stated, "It is the province of medical experts, not the appellate courts, to determine whether a room temperature of 85 degrees may be a factor in causing heat exhaustion . . ."320 N.C. at 504. The Full Commission, therefore, decides this case based on the medical testimony that heat was a contributing factor in decedent's heart attack and resulting death. Acknowledging that decedent was a "heart attack waiting to happen" and did not have heat exhaustion, the Commission declines to limit the Fields and Dillingham exceptions to diseases such as heatstroke, heat exhaustion, or heat prostration which are directly associated with the "special hazard" of heat.
2. Plaintiffs are entitled to recover death benefits. Plaintiffs, Mary Brown Madison, as the surviving widow, and Leonard Todd Madison, a minor, as the surviving son of the decedent, Leonard E. Madison, are entitled to recover $512.00 per week for 400 weeks from decedent's death on August 15, 1997. Compensation for Leonard Todd Madison shall continue until he reaches 18 years of age. G.S. §§ 97-38, 97-39.
3. Defendant shall pay burial expenses, not to exceed $3,500.00, to the person or persons entitled to receive these benefits. No evidence was presented concerning the amount of the burial expense for decedent and no evidence was presented as to whether this sum was paid, and if so, by whom. Should the parties be unable to reach agreement as to the amount of the burial expenses and the party entitled to receive this benefit, either party may file a Form 33 and request a hearing on these issues before a deputy commissioner.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enter the following
 AWARD
1. Defendants shall pay death benefits to plaintiffs in the amount of $512.00 per week for 400 weeks from the date of decedent's death. One half of this sum ($256.00) shall be paid to Mary Brown Madison, surviving widow, until Leonard Todd Madison, a minor, reaches 18 years of age, at which time the entire sum shall be paid to Mary Brown Madison. One half of this sum ($256.00) shall be paid to Mary Brown Madison, as the natural mother and guardian of the estate of Leonard Todd Madison, said funds to be used for the benefit of Leonard Todd Madison, a minor. The benefits that have accrued shall be paid in a lump sum, subject to attorney's fees awarded below. Unaccrued benefits shall be paid weekly until all benefits have been paid.
2. Plaintiffs' counsel is entitled to receive a fee of 25% of the sums recovered in paragraph 1, above. For accrued benefits, defendant shall withhold 25% of the benefits and pay this sum directly to counsel for plaintiffs. For unaccrued benefits, defendant shall pay every fourth check to plaintiff's counsel.
3. Defendant shall pay burial expenses, not to exceed $3,500.00, to the person or persons entitled to receive these benefits. No evidence was presented concerning the amount of the burial expense for decedent and no evidence was presented as to whether this sum was paid, and if so, by whom. Should the parties be unable to reach agreement as to the amount of the burial expenses and the party entitled to receive this benefit, either party may file a Form 33 and request a hearing on these issues before a deputy commissioner.
4. Defendant shall pay all costs.
 S/_______________ RENEE C. RIGGSBEE COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER